UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

| | |
|---|---|
| TYRONE WILSON, # 466855, ) | |
| ) | |
| Petitioner, ) | Case No. 1:10-cv-1032 |
| ) | |
| v. ) | Honorable Robert Holmes Bell |
| ) | |
| CINDI CURTIN, ) | |
| ) | |
| Respondent. ) | |
| _____) | |

## <u>OPINION</u>

This is a habeas corpus proceeding brought *pro se* by a state prisoner pursuant to

28 U.S.C. § 2254.  Petitioner's criminal convictions stem from his role in the killing of

Roland Johnson.  On February 23, 2007, a Kalamazoo County Circuit Court jury found

petitioner guilty of first-degree premeditated murder, Mich. Comp. Laws § 750.316(1)(a),

and possession of a firearm during the commission of a felony, Mich. Comp. Laws

§ 750.227b.  On April 9, 2007, petitioner was sentenced to life without parole on his first-

degree murder conviction and a consecutive two years' imprisonment on his felony

firearm conviction.  (ECF No. 15-13, PageID.1596).

After unsuccessful attempts to overturn his convictions in state court, petitioner

filed this habeas corpus petition.  Petitioner seeks federal habeas corpus relief on the

following grounds:

    I.    Petitioner was denied his due process right to a fair trial and his
right to confront the witnesses against him by the prosecution's
surprise admission of a report from the firearms expert that was
not disclosed in discovery.  Petitioner was denied the effective

assistance of counsel when his attorney failed to object or request a mistrial, continuance or other relief.

II.     Petitioner received ineffective assistance of counsel and the trial court's finding to the contrary was clearly erroneous and the court abused its discretion in denying petitioner's motion for a new trial.

III.    Trial counsel and appellate counsel were constitutionally ineffective in failing to object to inadmissible and highly prejudicial testimony that petitioner had previously been locked up and involved in selling drugs.

IV.     Prosecutorial misconduct in introducing perjured testimony of a key prosecution witness that contradicted the medical examiner's findings concerning the distance between the gun barrel and the deceased; alternatively, defense counsel was ineffective in failing to impeach the witness with inconsistent preliminary examination testimony concerning her observation of the shooting; furthermore, appellate counsel was ineffective in failing to raise this issue.

V.      Prosecutorial misconduct in knowingly presenting false testimony of a key witness deprived petitioner of a fair trial.

VI.     Petitioner was denied effective assistance of counsel when his trial attorney failed to adequately cross-examine Medical Pathologist Brian Hunter to show that there was no soot or powder tattooing of the skin around the gunshot wound.

VII.    Petitioner was denied effective assistance of appellate counsel when his appellate attorney (1) "failed to diligently find Ms. Simpson to confirm the newly discovered evidence claim;" and (2) failed to raise on direct appeal the ground that petitioner raised in his 6.500 motion.

(Amended Petition, ECF No. 11, PageID.121-35).[1]   Respondent argues that Grounds I and II should be denied for lack of merit and that Grounds III-VII are barred by the statute of limitations.  (ECF No. 16).

_____

[1]The Court has ignored petitioner's claims that he is entitled to federal habeas corpus relief based on purported violations of Michigan's constitution.  Federal habeas corpus relief is available "only on the ground that [petitioner] is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

After review of the state-court record, this Court concludes petitioner has not established grounds for federal habeas corpus relief.  Petitioner has not shown that the decision of the Michigan Court of Appeals rejecting Grounds I and II was "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States," or that it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Grounds III through VII are barred by the statute of limitations.  The petition will be denied.

## Standard of Review

The Court's review of this petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).  AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands the state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted).  "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). "State-court factual findings [] are presumed correct; the petitioner has the burden of rebutting the presumption by clear and convincing evidence." *Davis v. Ayala*, 135 S. Ct. 2187, 2199-2200 (2015) (citations and internal quotations omitted).

If a state court adjudicated the claim, deferential AEDPA standards must be applied.  28 U.S.C. § 2254(d); *see Premo v. Moore*, 562 U.S. 115, 121 (2011); *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009); *Holder v. Palmer*, 588 F.3d 328,

341 (6th Cir. 2009) (("[A]ny claim that was adjudicated on the merits in State court proceedings' is subject to AEDPA deference.") (quoting 28 U.S.C. § 2254(d)).  AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  It prohibits "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Parker v. Matthews*, 132 S. Ct. 2148, 2149 (2012) (*per curiam*).

The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).  "Section 2254(d) reflects the that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error corrections through appeal." *Id.* at 102-03 (citation and internal quotation omitted); *see Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015).  Section 2254(d) states that an application for a writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see White v. Wheeler*, 136 S. Ct. 456, 460 (2015); *Davis v. Ayala*, 135 S. Ct. at 2198; *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014).

-4-

The only definitive source of clearly established federal law for purposes of § 2254(d)(1) is the holdings—not dicta—of Supreme Court decisions. *White v. Woodall*, 134 S. Ct. at 1702; *see Woods v. Donald*, 135 S. Ct. at 1377 ("Because none of our cases confront 'the specific question presented by this case,' the state court's decision could not be 'contrary to' any holding from this Court."). "[W]here the precise contours of a right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *Id.* (quotations and internal citations omitted).

An unreasonable application of the Supreme Court's holding must be "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 134 S. Ct. at 1702 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003)). Rather, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 134 S. Ct. at 1702 (quoting *Harrington v. Richter*, 562 U.S. at 103). "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' " and "[i]t therefore cannot form the basis for habeas relief under AEDPA." *Hill v. Curtin*, 792 F.3d 670, 677 (6th Cir. 2015) (quoting *Parker v. Matthews*, 132 S. Ct. at 2155); *see Glebe v. Frost*, 135 S. Ct. 429, 431 (2014) (*per curiam*) ("As we have repeatedly emphasized, [] circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'").

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).  Section 2254 (d)(2) requires that this Court accord the state trial court substantial deference.  If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination. *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015); *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).

## Proposed Findings of Fact

### A.    District Court Proceedings

Petitioner was charged with open murder[2] in the March 27, 2006, killing of Roland Johnson and possession of a firearm during the commission of a felony. Petitioner received a preliminary examination in the 8th District Court in Kalamazoo. (ECF No. 15-2).  On May 3, 2006, Judge Quinn Benson bound over petitioner for trial in Kalamazoo County Circuit Court on all charges.  (*Id.* at PageID.398-99).

### B.    Circuit Court Proceedings

On Monday, October 9, 2006, Judge Philip Schaefer held a hearing on petitioner's attorney's motions for expert witness fees and to adjourn trial.  (ECF No. 15-4).  During the course of this hearing, the prosecutor advised defense counsel and

---

[2]Under Michigan law, the charge of open murder allows a defendant to be convicted of first-degree or second-degree murder or manslaughter, depending on the proofs.  MICH. COMP. LAWS § 767.71; *see People v. Johnson*, 398 N.W.2d 219, 222-23 (Mich. 1986); *see also Tran v. Berghuis*, No. 1:06-cv-428, 2014 WL 4063832, at *7 n.4 (W.D. Mich. Aug. 18, 2014); *Williams v. Jones*, 231 F. Supp. 2d 586, 589 (E.D. Mich. 2002).

the court that the resident of the home where Roland Johnson had been shot and killed had recently found what appeared to be a bullet fragment. It had been discovered during the process of cleaning the corner of the basement where the victim's body had been found. The bullet fragment was turned over to the police and the prosecutor learned of its existence on the Thursday or Friday before the hearing. The prosecutor indicated that the item was in the process of being packaged for delivery to a laboratory for testing. It was apparent that it would be necessary to determine whether this round came from the weapon fired by petitioner or whether it had been fired by the victim. (*Id.* at 4-5, PageID.413-14). The court granted petitioner's attorney's motions to adjourn the trial and for expert witness fees. (*Id.* at 6-7, PageID.415-16).

Petitioner's trial began on February 13, 2007, and it concluded on February 23, 2007, with the jury's verdict finding him guilty of first-degree premeditated murder and possession of a firearm during the commission of a felony. (Trial Transcripts (TT I-TT VII, ECF No. 15-6 through 15-12).

Petitioner's group of associates included Maurice Furcron (aka Julio), Travanti Black (aka Big Ned or Ned), and Michael Johnson (aka "Mike-Mike). Petitioner used the aliases "Rero" and "Ron Ron." (TT II, 353-57, ECF No. 15-7; TT III, 463-67, 487, 545-47, 564-66, 601-03, ECF No. 15-8; TT IV, 657-61, 734-40, ECF No. 15-9). Petitioner was Maurice Furcron's "flunky." (TT II, 360, 368; TT IV, 740). Petitioner would "do just about anything [Furcron] told him to do." (TT II, 360).

Christina Davis had been Maurice Furcron's girlfriend.  (TT II, 353, 373).  She broke up with Furcron a short time before Roland Johnson was shot and killed.  (TT II, 354).  Maurice Furcron had injured his leg and was using crutches.  Approximately two weeks before Johnson was killed, Furcron found Johnson's car at Tawana Simpson's residence at 1516 Humphrey Street.  Furcron was upset about Christina Davis's relationship with Roland Johnson.  Maurice Furcron used his crutch to smash out the windows in Roland Johnson's car.  (TT III, 463, 471-72, 479).

A few days later, on March 27, 2006, Roland Johnson returned to 1516 Humphrey Street.  Christina Davis, Alysa Davis, Shami Ballard, and Donald (aka "Dub") Cobb were also present.  This group was in the basement smoking marijuana and drinking alcohol.  (TT II, 375-77, 389-90; TT III, 427-30, 512-13, 531-32, 548).  Alysa Davis was talking to someone on the telephone and she revealed Roland Johnson's location.  (TT II, 392; TT III, 425).  Less than an hour later, petitioner, his aforementioned group of associates, and others were at 1516 Humphrey Street demanding entry.  (TT II, 395-96; TT III, 513).

Candie Briley testified that, on the night in question, she drove her van to 1516 Humphrey Street.  Briley had six passengers.  The four male passengers were petitioner, Maurice Furcron, Travanti Black, and Michael Johnson.  The two female passengers were Tionna Brown, and Crystal Ware.  (TT III, 563-69, 605-06; TT IV, 651-62).  Maurice Furcron was on crutches and he initially stayed by the van with Ms. Briley while the others went up to the house and began banging on the doors and windows and yelling.  (TT III, 572-73).  Neighbors heard a lot of banging and cursing

-8-

and loud noises coming from 1516 Humphrey. They heard someone demanding that the door be opened and saw a number of people running around the house and banging on the doors and windows. A short time thereafter, they heard gunshots that sounded like firecrackers. (TT II, 293-99, 304-08).

Christina Davis testified that Maurice Furcron had threatened to kill her if he caught her with another guy. (TT II, 396). She recognized Travanti Black's voice as he was demanding that the occupants open the door. She recognized petitioner's voice. She later heard Maurice Furcron's voice after his group gained entry into the residence. Christina Davis also heard Candie Briley and Tionna Brown. (TT II, 397, 402).

When the people inside the home failed to open the door, the pounding became more violent. (TT II, 397; TT III, 513-15). Prints matching Michael Johnson's shoes were found on the front door. (TT V, 874-75, ECF No. 15-10). Christina Davis heard people moving around the outside of the house. (TT II, 398-400). She heard the sound of someone breaking in through an upstairs window. (TT II, 401; TT III, 473-74). Donald Cobb testified that he went upstairs when he heard the banging. (TT III, 516-17). He became frightened when he heard someone coming in through the bathroom window. (TT III, 517-22). Michael Johnson testified that, with assistance from Travanti Black and petitioner, he was able to get inside the house through the bathroom window. (TT IV, 668-71). Donald Cobb opened the front door and ran away. (TT IV, 672-73, 747). Cobb testified that a group of men rushed in past him as he was

headed in the opposite direction.  (TT III, 517-22).  Cobb was well away from the house when the shooting started.  (TT III, 523).

Candie Briley saw someone open the door.  Petitioner, Travanti Black, and Michael Johnson rushed inside.  Briley accompanied Furcron from the van into the house.  (TT III, 573).  Briley testified that she was on the stairs a few steps behind Furcron when she heard gunshots.

Michael Johnson testified that petitioner was the first of his group to go through the front door and that petitioner immediately went downstairs.  (TT IV, 673). Travanti Black and Tionna Brown were next.  Michael Johnson testified that he came next, and that he was near the middle of the stairs, with Maurice Furcron and Crystal Ware further up on the stairs behind him, when the shooting started.  (TT IV, 674-77).

Crystal Ware testified that petitioner grabbed Roland Johnson by the collar. Roland Johnson appeared "scared like he knowed [sic] he was going to die."  (TT IV, 749).  Petitioner pulled a gun from his waistline.  Roland Johnson fought for his life and tried to keep petitioner from pointing the gun at him.  Roland Johnson lost this struggle and he was shot, and then fell.  Petitioner retained the gun in his hands. (TT IV, 752-57, 767).  Crystal Ware testified that she heard three or four shots.  (TT IV, 763).

Michael Johnson heard around six gunshots.  (TT IV, 677-78).  Johnson testified that he saw petitioner coming up the stairs and wiping off the gun.  Petitioner handed the gun to Johnson.  Johnson looked inside the revolver and saw that all the bullets

had been fired. Petitioner had the gun with him when he got back into the van. (TT IV, 681-85).

Christina Davis and Shami Ballard had hidden themselves in a laundry area under the basement stairs. (TT II, 403, 407; TT III, 432, 439, 533-35). Christina Davis heard the voices of Travanti Black and Michael Johnson as they were coming downstairs to confront the victim. (TT II, 404, 436-37). She heard Maurice Furcron as he was coming down the stairs. Furcron was demanding that Roland Johnson tell him where Christina Davis was located. (TT II, 405, 434). Christina Davis testified that she heard petitioner's voice, followed by what may have been a push or scuffle. She then heard gunshots ring out. She thought that there had been a total of six shots. (TT II, 406-07).

Shami Ballard heard four of five gunshots. She testified that the shots sounded like they came from inside the basement, not from the stairs. (TT III, 535-36).

Christina Davis heard Travanti Black exclaim that the group should leave, which was followed by "a whole bunch of running up the stairs." (TT II, 407). According to Christina Davis and Shami Ballard, Alysa Davis had been out in the open with the intruders, rather than hiding with them under the basement stairs. (TT II, 407-08; TT III, 444). After petitioner's group fled, Alysa Davis had a smirk on her face and was acting like nothing had happened. (TT II, 409). She did not appear to be upset that Roland Johnson had been shot. (TT III, 444).

Candie Briley testified that petitioner had a revolver in his hand as he came back up the stairs. (TT III, 577-78). Petitioner came up the stairs "normal like nothing

had happened." (TT III, 578). Michael Johnson took the gun from petitioner and opened it. Johnson commented that petitioner had emptied the whole gun. Michael Johnson appeared to be amused that petitioner had fired enough shots to empty his gun. (TT III, 578-80).

According to Candie Briley, the group lingered in the house for "a good five minutes or so after the shooting." (TT III, 578). Crystal Ware commented how stupid the guys were for doing what they did and she urged the group to leave as soon as possible. (TT III, 581). It was another three to five minutes before everyone was back inside the van. Petitioner, Travanti Black, and Michael Johnson were the last three to leave the building and get back into the van. (TT III, 582-83). Candie Briley was crying and petitioner was "hollering at her telling her to go drive." (TT IV, 754). As Briley was driving away, Travanti Black indicated that he had checked the victim's pocket and took the marijuana that he found. (TT III, 581-84).

Roland Johnson's labored breathing was audible. He was on his left side and he was bleeding from his head wound. (TT II, 408, 417; TT III, 440-41). His head was pushed up in the "corner of the bottom of the wall." (TT II, 419; TT III, 441).

Neighbors alerted police that a black van with an "AAA" licence plate number had fled the scene of the shooting. (TT II, 312, 315, 335-36). Within a few minutes of receiving a call from dispatch, police came into contact with a van matching that description and license plate. (TT II, 315; TT V, 816). Police conducted a felony stop. (TT II, 316). The occupants of the van did not comply with police commands. (TT II,

-12-

317, 337).  Candie Briley testified that petitioner put a gun to her head and indicated that if she did not drive away, he was going to shoot her.  (TT III, 585-86).

Ms. Briley was not sure that petitioner's gun was empty.  She drove away and led police on a high speed chase.  (TT II, 316-17, 338-40, 596).  During the chase, petitioner asked if there was anything in the van that he could use to get the gunpowder residue off his hands.  Tionna Brown indicated that she had a douche in her bag.  Petitioner used it to clean his hands and then wiped his hands dry on a pillowcase.  Petitioner also used the pillowcase to wipe his fingerprints off the gun before he threw the gun out the window.  (TT III, 589-90; TT IV, 687-89, 757-62).  Petitioner's attempt to remove the gunpowder residue proved ineffectual.  His hands and clothing tested positive for gunpowder residue.  (TT V, 913-27).

Police were eventually able to end the pursuit by disabling the van's tires with spike strips.  (TT II, 317, 338-41).  Police recovered the .32 caliber revolver and the pillowcase that had been thrown out the window of the van during the chase.  (TT II, 319-26; TT III, 626; TT V, 830-36, 883).  A trace of the gun's serial number revealed that it had been stolen.  (TT II, 330, 334; TT V, 836).  There were four spent casings in the revolver and one empty chamber.  (TT V, 883-84).

Michael Johnson testified that, during the police chase, he saw Travanti Black dumping out the marijuana that had been taken from the victim onto the van's floor.  (TT IV, 692).  Police found the loose marijuana and the douche bottle on the van's floor.  Roland Johnson's cell phone was inside the van.  Back at the Humphrey Street address, police found that one of Roland Johnson's shoes had been thrown into a

bedroom and the other was out in the yard.  Testimony established that shoes were a common place for hiding controlled substances.  (TT V, 797-98, 818-21, 857, 937-44, 948; TT VI, 959, ECF No. 15-11).

Police took the seven occupants of the van into custody.  The four males were petitioner, Maurice Furcron, Travanti Black, and Michael Johnson.  The three females were Candie Briley, Tionna Brown, and Crystal Ware.  (TT II, 341-45; TT IV, 700).  Petitioner lied about his identity.  (TT V, 776).

When police arrived at 1516 Humphrey Street, two unidentified women directed them to the wounded man in the basement.  (TT V, 902).  Christina Davis was hysterical and she would not leave Roland Johnson's side.  Roland Johnson had been shot in the head.  He was still breathing, but otherwise unresponsive.  (TT V, 903-04).  Roland Johnson was transported to the hospital where he was pronounced dead shortly after his arrival.  (TT IV, 791; TT V, 904).

The state of the victim's clothing had been noted at the hospital.  A pocket of the camouflage jacket that he was wearing was turned completely inside out.  His shoes were missing.  (TT V, 948).

A forensic pathologist testified that Roland Johnson died of multiple gunshot wounds.  (TT IV, 718).  It was stipulated that the cause of Roland Johnson's death was the gunshot wound to his head.  (TT II, 256).  Bullet fragments were recovered from beneath the scalp on the right side and from his brain on the left side.  (TT IV, 710, 715-16).  Roland Johnson also had a gunshot wound to his right leg, with a graze wound to the back of his left leg.  (TT IV, 720).

-14-

Police found a Colt .25 caliber semiautomatic handgun and a single .25 caliber casing in the basement at 1516 Humphrey Street.  (TT V, 801-02, 878-79).  This gun that had a six round clip.  There were four rounds in the magazine and one round in the chamber.  (TT V, 882).

Tawana Simpson testified that when she cut away the bloodstained carpet from the corner of her basement at 1516 Humphrey Street where Roland Johnson had been shot, she found what appeared to be a bullet and she gave it to the police.  (TT III, 474-76; TT VI, 954-55).  Earlier police had recovered two spent rounds in addition to round recovered from Roland Johnson's head.  (TT IV, 710, 715-16; TT V, 791-75; TT VI, 956).  Jeff Crump testified as an expert in the field of firearms and ballistics.  (TT VI, 963).  He testified that all of the bullets recovered could have been fired from the .32 caliber revolver.  The bullets could not have been fired from the .25 caliber handgun.  (TT VI, 967-79).

Petitioner elected to testify.  (TT VI, 1017-52).  Petitioner conceded that he had been at 1516 Humphrey Street on the night in question.  (TT VI, 1019, 1023).  He admitted that he had a gun.  He admitted that he had four rounds in the gun and that he shot all of them towards Roland Johnson.  (TT VI, 1026, 1036, 1044).  Petitioner denied shooting Roland Johnson because Maurice Furcron told him to do it.  (TT VI, 1021).  Petitioner claimed that he was not looking at Johnson when he fired the shots.  He claimed that he was "turning up the stairs" as he was shooting.  (TT VI, 1029, 1044).  Petitioner claimed that he had acted in self-defense or in defense of Maurice Furcron.  (TT VI, 1031).

Petitioner denied taking anything from Roland Johnson.   (TT VI, 1031). Petitioner denied putting a gun to Candie Briley's head and demanding that she drive away from the police.  (TT VI, 1028).  He denied cleaning his hands with the douche and drying his hands on the pillowcase.  (TT VI, 1046).  He testified that Michael Johnson had the revolver and that Johnson threw it out the van's window.  (TT VI, 1047).  Petitioner testified that when he was apprehended he gave a false name because there was an outstanding warrant for his arrest.  (TT VI, 1031, 1051).

After the close of proofs, the attorneys delivered their closing arguments.  Among other things, the prosecutor argued that the physical evidence indicated that the victim had been trying to escape.  The bullet Ms. Simpson found in the corner would not have ended up in that location and condition if it had been fired from the stairway as plaintiff claimed.  He argued that petitioner's claims that he had acted in self-defense or in defense of Maurice Furcron made no sense.   The evidence indicated that petitioner wounded his victim, then capped him off in the corner with two rounds, one missed and the other went into Roland Johnson's brain and killed him.  Petitioner then took the victim's marijuana, shoes, and cell phone.   The prosecutor argued that petitioner's actions of forcing the police chase and attempting to destroy and dispose of evidence were not actions compatible with petitioner's claims of self-defense or defense of others.  (TT VII, 1064-97; 1108-1120, ECF No. 15-12).  Petitioner's attorney attempted to convince the jury that the prosecution had not carried its burden of proof and that it should credit petitioner's testimony that he had acted in self defense or in defense of Maurice Furcron.  (TT VII, 1097-1108).

Judge Schaefer delivered the jury instructions.  The jury deliberated for about three hours and then returned its verdict finding petitioner guilty of first-degree premeditated murder, felony murder, and carrying a firearm during the commission of a felony.  (TT VII, 1149-50).

On April 9, 2007, Judge Schaefer conducted a sentencing hearing.  (Sentencing Transcript (ST), ECF No. 15-13).  The sentences petitioner faced were mandatory sentences.  He had nothing to say when offered an opportunity for allocution.  Judge Schaefer described petitioner's first-degree murder of Roland Johnson as "a cold-blooded, pigheaded assassination." (ST, 4).  Further, the judge observed: "I don't think I've ever seen a more callous killing in my 21 years on the bench – And I've seen a lot of bad ones." (ST, 4).  Judge Schaefer sentenced petitioner to the mandatory sentences of life without parole on his first-degree murder conviction and a consecutive two years' imprisonment on his felony firearm conviction.   (ST, 5; Judgment of Sentence Commitment to Corrections Department, ECF No. 15-15, PageID.1688).

### B.    Subsequent Proceedings

Petitioner pursued an appeal in the Michigan Court of Appeals.  Petitioner's appellate counsel raised the issues now found in Ground I of petitioner's habeas corpus petition.   (Defendant-Appellant's Brief at 2, Statement of Questions Presented, ECF No. 15-15, PageID.1696).  Appellate counsel also filed a motion for remand to the trial court for an evidentiary hearing regarding a perceived discovery violation and possible ineffective assistance of counsel.  (ECF No. 15-15, PageID.1715-16).   On January 2, 2008, the Michigan Court of Appeals granted the motion and remanded the

matter to allow petitioner to file a motion for a new trial and for an evidentiary hearing regarding petitioner's claims of a discovery violation and ineffective assistance of counsel.  (ECF No. 15-15, PageID.1721).

The trial court conducted an evidentiary hearing where it received testimony from petitioner's trial counsel and the prosecuting attorney.  The judge also heard oral argument on petitioner's motion for a new trial.  (ECF No. 15-14).  On November 24, 2008, the trial court judge entered his opinion and order denying petitioner's motion for a new trial.  He rejected petitioner's claims of ineffective assistance of counsel and a *Brady* violation.  (ECF No. 15-15, PageID.1752-64).  The judge noted that physical evidence as well as testimony placed petitioner in the basement at the time of the shooting, which contradicted petitioner's testimony.  Petitioner could not show that the evidence forming the foundation of his meritless claim of a *Brady* violation was favorable to him.  He could only assert that "he would have changed his story when he confronted this 'new' evidence."  (*Id.* at PageID.1762).

Petitioner's appellate counsel filed a supplemental brief on appeal, which raised the issues now found in Ground II of the amended habeas corpus petition.  (ECF No. 15-15, PageID.1737).  On June 9, 2009, the Michigan Court of Appeals entered its decision rejecting petitioner's arguments and affirming his convictions.  (ECF No. 15-15, PageID.1680-86; *People v. Wilson*, No. 277572, 2009 WL 1607466 (Mich. Ct. App. June 9, 2009)).  On October 26, 2009, the Michigan Supreme Court denied petitioner's application for leave to appeal.  (ECF No. 15-16, PageID.1803).

-18-

On October 18, 2010, petitioner filed his petition seeking federal habeas corpus relief.[3]   (Petition, ECF No. 1).   Petitioner sought habeas corpus relief on the two grounds that the Michigan Court of Appeals had rejected on direct appeal.   (*Id.* at ¶ 14, PageID.6-7; *see also* ECF No. 1-3, PageID.28).

On March 16, 2011, petitioner filed his motion asking the Court to hold his habeas petition in abeyance pending exhaustion of otherwise unexhausted claims in state court.   (ECF No. 6, 7, 7-1; *see also* Petitioner's Brief at 1, ECF No. 17, PageID.3617).   On April 1, 2011, the Court entered an order granting petitioner's motion for stay and abeyance.   (ECF No. 8).   This case was administratively closed until such time as petitioner filed a motion to amend his petition in accordance with the procedures set forth in the Court's order.   (*Id.*).

On April 28, 2011, petitioner filed a motion for relief from judgment in the trial court.   (ECF No. 15-20).   On September 15, 2011, petitioner's attorney filed a supplement to the motion for relief from judgment.   (ECF No. 15-21, PageID.3461).

On November 8, 2011, the trial court judge entered his opinion and order denying petitioner's motion for relief from judgment.   (ECF No. 15-22).   He rejected petitioner's claims of prosecutorial misconduct.   He found that the challenged testimony from Christina Davis had not prejudiced the jury against petitioner's

---

[3]The October 18, 2010, filing date gives petitioner the benefit of the "mailbox rule."  Under the "mailbox rule," a prisoner's habeas petition is deemed filed when he posts it in the prison mail system. *See Miller v. Collins*, 305 F.3d 491, 497-98 (6th Cir. 2002).  Here, despite the absence of evidence from petitioner regarding the date he gave his petition to prison officials for mailing, the Court is giving petitioner the benefit of the earliest possible filing date.  It is assumed for present purposes that petitioner filed his petition on the date he signed it.  (*See* ECF No. 1, PageID.14).

testimony.  (*Id.* at PageID.3518).  The testimony of Christina Davis, revealing that petitioner was previously "locked up" and did a drug run for his friend, Maurice Furcron, "elicited only the manner of the friendship between [petitioner] and Mr. Furcron.  The Prosecutor did not offer the testimony for character reference and it was not in violation of MRE 404(b) or MRE 609.  The jury was free to determine issues of witness credibility."  (*Id.* at PageID.3519).  The judge determined that petitioner's "theory that the jury likely rejected his testimony because he had previously been arrested and previously sold illegal drugs [did] not outweigh the evidence in this case, on which [petitioner] was found guilty."  (*Id.*).

The judge found that the remaining grounds raised by petitioner (other than ineffective assistance of appellate counsel) were barred by procedural defaults.  Those grounds were either "decided against [petitioner] previously, or allege[d] grounds for relief which could have been raised on appeal."  (*Id.* at PageID.3521).  Petitioner had "not shown good cause for failing to raise such grounds, nor actual prejudice."  (*Id.*).

The trial court judge applied the *Strickland*[4] standards and rejected petitioner's claims of ineffective assistance of appellate counsel for lack of merit.  (ECF No. 15-22 at PageID.3520-21).  He found that there was not a likelihood that the jury would have discounted Crystal Ware's testimony if the jury had learned she previously testified at the preliminary examination that she "guessed" the gun shot the decedent in the head.  (*Id.*).  The judge held that petitioner had "not shown that counsel's performance was deficient or that the deficient performance prejudiced the defense.  [Petitioner] ha[d]

---

[4]*Strickland v. Washington*, 466 U.S. 668 (1984).

not established that his trial or appellate counsel's performance was below the objective standard of reasonableness under prevailing professional norms or that the outcome of the proceedings would have been different." (*Id.*).

Petitioner sought review of the trial court's decision denying his motion for relief from judgment in Michigan's appellate courts. On September 24, 2013, the Michigan Court of Appeals denied petitioner's delayed application for leave to appeal for "failure to meet his burden of establishing entitlement to relief under MCR 6.508(D)." (ECF No. 15-18, PageID.2580). On February 28, 2014, the Michigan Supreme Court denied petitioner's application for leave to appeal on the same basis. (ECF No. 15-19, PageID.3330).

On March 21, 2014, petitioner filed his motion to amend his petition. (ECF No. 10). On March 24, 2014, the Court entered its order reopening the case. The same order granted petitioner's motion for leave to amend and his proposed amended petition was deemed filed *instanter*."[5] (ECF No. 13).

## Discussion

### I.    Alleged Brady Violation

In Ground I, petitioner argues that he was denied his due process right to a fair trial and his right to confront the witnesses against him by the admission of a report from firearms expert Jeffrey Crump that petitioner claims had not been disclosed in

---

[5] *Instanter* means "[i]nstantly; at once." BLACK'S LAW DICTIONARY, 917 (10th ed. 2009). The Court's order established that the amended petition was filed on March 24, 2014. The Court made no determination regarding whether the newly exhausted grounds related back to the original petition for statute of limitations purposes.

discovery. Petitioner also claims ineffective assistance of counsel when his attorney failed to object or request a mistrial, continuance or other relief when she learned of Crump's report. (Amended Petition, ECF No. 11, PageID.121-23; Petitioner's Brief at 2, 14-19, ECF No. 11-1,PageID.145, 158-63; Petitioner's Reply Brief at 6-8, ECF No. 17, PageID.3622-24).

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The Court has held that "[t]here are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see also Kyles v. Whitley*, 514 U.S. 419, 433 (1995). Prejudice and materiality are established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 281 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also Cone v. Bell*, 556 U.S. 449, 469-70 (2009). A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

The Michigan Court of Appeals carefully applied the *Brady* standards to petitioner's due process claim and the *Strickland* standards to petitioner's related

-22-

claim of ineffective assistance of counsel, and it held that there had been no violation of petitioner's constitutional rights. *See People v. Wilson*, No. 277572, 2009 WL 1607466, at *2-4 (Mich. Ct. App. June 9, 2009) (citations omitted). The Court finds that petitioner has not shown that the decision of the Michigan Court of Appeals "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

## II.     Ineffective Assistance of Counsel

In Ground II, petitioner claims ineffective assistance of trial counsel and error in denying petitioner's motion for a new trial. These issues were initially raised by petitioner's appellate counsel in the motion for a new trial and later on direct appeal. (Amended Petition, PageID.124-25; Supplemental Brief at 6, 11-20, ECF 11-1, PageID.175, 180-89; Petitioner's Reply Brief at 4-6, ECF No. 17, PageID.3620-22).

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. Petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced petitioner resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687-88. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Petitioner bears the burden of overcoming the

presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).   On the prejudice prong, "[petitioner] must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Because Michigan's courts decided petitioner's claims of ineffective assistance of counsel on the merits, their decisions must be afforded deference under AEDPA.  *See Burt v. Titlow*, 134 S. Ct. at 15-18; *Harrington v. Richter*, 562 U.S. at 98-101.  To receive habeas relief, petitioner must demonstrate that the state courts' decisions were contrary to, or represented an unreasonable application of, *Strickland v. Washington*. *See Bell v. Cone*, 535 U.S. at 698-99.

Hence, it is not enough to convince the federal habeas court that, in its independent judgment, the state-court decisions applied *Strickland* incorrectly. Rather, petitioner must show that the state courts "applied *Strickland* to the facts of his case in an objectively unreasonable manner."  *Bell*, 535 U.S. at 699; *see Campbell v. Bradshaw*, 674 F.3d 578, 586-87 (6th Cir. 2012).  This creates a "high burden" for petitioner.  *See Carter v. Mitchell*, 443 F.3d 517, 525 (6th Cir. 2006); *see also Hodges v. Colson*, 727 F.3d 517, 534 (6th Cir. 2013).  "[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).  Supreme Court decisions describe this as "the doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard."

*Knowles*, 556 U.S. at 123; *see Woods v. Donald*, 135 S. Ct. at 1376; *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (*per curiam*).

The question before the habeas court, then, is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Premo v. Moore*, 562 U.S. at  123; *see McGowan v. Burt*, 788 F.3d 510, 515 (6th Cir. 2015).   Petitioner must show that the state courts' ruling on the claim being presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. at 103).

The Michigan Court of Appeals applied the federal standard established in *Strickland* and rejected petitioner's claims of ineffective assistance of trial counsel.  *See People v. Wilson*, 2009 WL 1607466, at *4-6 (citations omitted).  The Court finds that petitioner has not shown that the decision of the Michigan Court of Appeals was "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" under the "doubly deferential" standard of review.  28 U.S.C. § 2254(d)(1).

## III.    Statute of Limitations

Respondent argues that Grounds III through VII of the amended petition are barred by the statute of limitations.  (Answer at 35-51, ECF No. 16, PageID.3557-74).  Petitioner's application is subject to the one-year statute of limitations provided in 28 U.S.C. § 2244(d)(1).  *See Hill v. Mitchell*, Nos. 13-3412, 3492, __ F.3d __, 2016 WL 7010004, at *4 (6th Cir. Dec. 1, 2016) (The Court "may not review claims at all unless

the petitioner satisfies AEDPA's procedural requirements -- including the requirement that a petitioner bring his claims within AEDPA's one-year statute of limitations period.").

Under § 2244(d)(1)(A), the one-year limitations period runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." Petitioner appealed his conviction to the Michigan Court of Appeals and requested leave to appeal to Michigan's highest court On October 26, 2009, the Michigan Supreme Court denied petitioner's application for leave to appeal. Petitioner did not petition for certiorari to the United States Supreme Court. Nonetheless, the one-year statute of limitations period did not begin to run until after the ninety-day period in which petitioner could have sought review in the United States Supreme Court. *See Gonzalez v. Thaler*, 132 S. Ct. 641, 653-54 (2012); *see also Giles v. Beckstrom*, 826 F.3d 321, 323 (6th Cir. 2016). The ninety-day period expired on January 27, 2010. Accordingly, absent tolling, petitioner had one year, until January 27, 2011, in which to file a habeas petition raising all the grounds on which he claims entitlement to federal habeas corpus relief.

The one-year statute of limitations applies to each claim in a habeas application, as opposed to the application as a whole. *See Hill v. Mitchell*, 2016 WL 7010004, at *6-7; *see also Capozzi v. United States*, 768 F.3d 32, 33 (5th Cir. 2014); *Mardesich v. Cate*, 668 F.3d 1164, 1170 (9th Cir. 2012). On October 18, 2010, petitioner filed his petition seeking federal habeas corpus relief. Petitioner raised the two grounds that had been

-26-

rejected by the Michigan Court of Appeals on direct appeal.  It is undisputed that Grounds I and II are not barred by the statute of limitations.

A.    <u>Section 2244(d)(2)</u>

Petitioner argues that he is entitled to the benefit of statutory tolling under 28 U.S.C. § 2244(d)(2).  (Petitioner's Reply Brief at 4, ECF No. 17, PageID.3620).  He is incorrect.

Section 2244(d)(2) provides: "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." Petitioner's filing of his federal habeas corpus petition did not toll the statute of limitations.  *See Duncan v. Walker*, 533 U.S. 167, 181 (2001) ("We hold that an application for federal habeas corpus review is not an 'application for State post-conviction or other collateral review' within the meaning of 28 U.S.C. § 2244(d)(2).").  Section 2244(d)(2) did not toll the limitation period during the pendency of the federal habeas petition.

The running of the statute of limitations only is tolled when "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending."[6] 28 U.S.C. § 2244(d)(2); *see also Duncan v. Walker*, 533 U.S. at 181-82 (limiting the tolling provision to only State, and not

---

[6]"By tolling the limitation period for the pursuit of state remedies and not during the pendency of applications for federal review, § 2244(d)(2) provides a powerful incentive for litigants to exhaust all available state remedies before proceeding in the lower federal courts." *Duncan*, 533 U.S. at 180.

Federal, processes); *Artuz v. Bennett*, 531 U.S. 4, 8 (2000) (defining "properly filed"). This statutory provision is of no benefit to petitioner because petitioner did not file his motion for post-conviction relief until long after the statute of limitations had already run on Ground III through VII.

The one-year limitations period expired on January 27, 2011. Grounds V through VII were asserted in the application for post-conviction relief that petitioner filed on April 28, 2011, three months after the statute of limitations had run. Petitioner's attorney raised the issues corresponding to Grounds III and IV on September 15, 2011, in a supplement to the motion for relief from judgment. This was roughly eight months after the statute of limitations had run.

The tolling provision of 28 U.S.C. § 2244(d)(2) does not "revive" the limitations period (i.e., restart the clock at zero). "[I]t can only serve to pause a clock that has not yet fully run." *Vroman v. Brigano*, 346 F.3d 598, 602 (6th Cir. 2003) (citation omitted); *see Allen v. Yukins*, 366 F.3d 396, 401 (6th Cir. 2004); *McClendon v. Sherman*, 329 F.3d 490, 493 (6th Cir. 2003)*; Payton v. Brigano*, 256 F.3d 405, 408 (6th Cir. 2001); *see also Sharp v. Brewer*, No. 2:16-cv-99, 2016 WL 4498288, at *3 (W.D. Mich. Aug. 3, 2016) ("Once the limitations period is expired, collateral petitions can no longer serve to avoid a statute of limitations.").

B.      Equitable Tolling

The statute of limitations is subject to equitable tolling under appropriate circumstances.[7]  *Holland v. Florida*, 560 U.S. 631, 645 (2010).  Petitioner bears the burden of showing that he is entitled to equitable tolling.  *See Robertson v. Simpson*, 624 F.3d 781, 784 (6th Cir. 2010).  A habeas petitioner seeking equitable tolling of the statute of limitations has the burden of establishing two elements: (1) that "he has been pursuing his rights diligently;" and (2) that "some extraordinary circumstance stood in his way and prevented timely filing."  *Holland*, 560 U.S. at 649; *Hall v. Warden, Lebanon Corr. Inst.*, 662 F.3d at 750.

Petitioner argues that he should be entitled to equitable tolling because "he complied with this Court's order" regarding stay and abeyance.  (Petitioner's Reply Brief at 1-4, ECF No. 17, PageID.3617-20).  Stay and abeyance under the Court's order gave petitioner a chance to exhaust his available state remedies.  It did not allow petitioner to avoid the statute of limitations defense if respondent elected to assert that defense in her answer to the amended petition.[8]

The statute of limitations expired on January 27, 2011.  Grounds III through VII were time-barred long before petitioner filed his motion for stay and abeyance (ECF

---

[7]The Sixth Circuit repeatedly has cautioned that equitable tolling should be applied "sparingly" by this Court.  *See Hall v. Warden, Lebanon Corr. Inst.*, 662 F.3d 745, 749 (6th Cir. 2011).

[8]"A statute of limitations defense . . . is not "jurisdictional," hence courts are under no *obligation* to raise the time bar *sua sponte*."  *Day v. McDonough*, 547 U.S. 198, 205 (2006).  A federal habeas court has discretion whether to raise the one-year statute of limitations *sua sponte*.  *Id.* at 202, 209; *see Wood v. Milyard*, 132 S. Ct. 1826, 1833 (2012).

No. 6) if respondent asserted that statute of limitations defense.  Nothing in the Court's order (ECF No. 8) provides a basis for equitable tolling.

Petitioner provides no explanation why he waited so long to file a motion for relief from judgment in the trial court raising Grounds III through VII.  (*see* ECF No. 6, 7, 17).  Petitioner has not carried his burden of establishing that he has been pursuing his rights diligently and that some extraordinary circumstance stood in his way and prevented timely filing.  *Holland*, 560 U.S. at 649.  The Court finds that petitioner is not entitled to equitable tolling.

C.    Relation Back

Petitioner cannot claim the benefit of the October 18, 2010, filing date for any claims in the amended petition that do not relate back to the original petition. *See* FED. R. CIV. P. 15(c)(1); *Mayle v. Felix*, 545 U.S. 644, 664 (2005) (defining "relation back" in the habeas context).  The Court finds that Grounds III through VIII do not relate back to the grounds raised in the initial petition.

Rule 15(c) provides that an amendment relates back to the date of the original pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." FED. R. CIV. P. 15(c)(1)(B).  With respect to the amendment of a section 2254 petition, the United States Supreme Court has rejected the argument that the "conduct, transaction, or occurrence" should be defined to include any pretrial, trial, or post-trial error that arises from the conviction under attack in the original petition. *Mayle v. Felix*, 545 U.S. at 661.  Relation back is permitted "only when the claims

-30-

added by amendment arise from the same core facts as the timely filed claims, and not when the new claims depend upon events separate in 'both time and type' from the originally raised episodes." 545 U.S. at 657.

After noting that AEDPA provides a one-year statute of limitations for filing habeas petitions, the *Mayle* Court observed: "If claims asserted after the one-year period could be revived simply because they relate to the same trial, conviction or sentence as a timely filed claim, AEDPA's limitation period would have slim significance." *Id.* at 662. Thus, "[a]n amended habeas petition, we hold, does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Id.* at 650; *see Hill v. Mitchell*, 2016 WL 7010004, at *6.

Grounds III through VII do not relate back to the original petition under this rule. Relation back is permitted only when the claims added by amendment arise from the same "core facts" as the timely filed claims, but not when the new claims depend on events separate both in time and in type from the originally raised episodes. *Mayle*, 545 U.S. at 657; *Hill v. Mitchell*, 2016 WL 7010004, at *6.

Ground I is the is the purported *Brady* violation and the related ineffective assistance of counsel claim that the Michigan Court of Appeals rejected. Ground II repeats the ineffective assistance of counsel claims raised in connection with petitioner's motion for a new trial that the Michigan Court of Appeals likewise rejected. Ground III is a new claim of ineffective assistance of trial counsel based on an assertion that counsel failed to object to testimony indicating that petitioner had

previously been locked up and involved in selling drugs and a related claim of ineffective assistance of appellate counsel for failure to raise the issue on direct appeal. Grounds IV and V are new claims of prosecutorial misconduct based on purported instances of eliciting perjured testimony.  Ground VI is a new claim of ineffective assistance of counsel based on perceived inadequacies in counsel's cross-examination of Pathologist Brian Hunter.[9]  Ground VII is a new claim of ineffective assistance of appellate counsel.  Grounds III through VII of petitioner's first amended petition do not arise out of the same core facts as his timely asserted claims.  The Court finds that they do not relate back to the initial filing date and that they are barred by the statute of limitations.

## IV.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather,

---

[9]"[A] petitioner does not satisfy the Rule 15 'relation back' standard merely by raising some type of ineffective assistance in the original petition, and then amending the petition to assert another ineffective assistance claim based upon an entirely distinct type of attorney misfeasance." *United States v. Ciampi*, 419 F.3d 20, 24 (1st Cir. 2005); *see also United States v. Stover*, 576 F. Supp.2d 134, 140 (D.D.C.2008) (where petitioner made general claims of ineffective assistance of counsel, new claims of distinct types of attorney malfeasance occurring before, during and after trial do not relate back to the original petition under Rule 15).

the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.*   Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDonnell*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467.   Consequently, the Court has examined each of petitioner's claims under the *Slack* standard.

Petitioner cannot demonstrate that reasonable jurists would find that the denial of habeas corpus relief on each of the grounds raised in his petition is debatable or wrong. *See Slack*, 529 U.S. at 484.   Accordingly, the Court will enter an order denying petitioner a certificate of appealability.

## Conclusion

For the foregoing reasons, the habeas corpus petition will be denied.


Dated: <u>December 14, 2016</u>                         <u>/s/ Robert Holmes Bell</u>
                                                         ROBERT HOLMES BELL
                                                         UNITED STATES DISTRICT JUDGE